**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

| | |
|---|---|
| **In re:**<br><br>**GREAT MARSH BREWING COMPANY,**<br><br>**Debtor.** | **Chapter 11**<br><br>**Case No. 26-11364-CJP** |

**MOTION FOR (A) THE USE OF CASH COLLATERAL, (B) THE**
**GRANTING OF REPLACEMENT LIENS, AND (C) ADDITIONAL RELIEF**
**(Emergency Consideration Requested)**

Blue Ivy, LLC ("Blue Ivy"), the debtor and debtor-in-possession in the above captioned

case, and its affiliated chapter 11 debtor-in-possession Great Marsh Brewing Company ("Great

Marsh" and together with Blue Ivy the "Debtors") move the Court pursuant to sections 105 and

363 of the United States Bankruptcy Code (the "Bankruptcy Code"), Federal Rules of

Bankruptcy Procedure 2002, 4001, and 9014, and MLBR 4001-2, for:

a. The entry, on an emergency basis, of an interim order authorizing the use of Cash
Collateral (as defined in section 363(a) of the Bankruptcy Code) on the terms set
forth in this motion, in an amount necessary to avoid immediate and irreparable
harm;

b. The entry of a permanent order authorizing use of Cash Collateral on the terms set
forth in this motion;

c. The granting of replacement liens for the use of cash collateral to Newburyport
Five Cents Savings Bank ("Newburyport") that: (i) are limited to the same types
of post-petition property of the estate against which the Newburyport held liens as
of the Petition Date (as defined below); (ii) maintain the same priority, validity
and enforceability as the Newburyport's pre-petition liens; (iii) shall be
recognized only to the extent of the diminution in value of the Newburyport's pre-
petition collateral after the Petition Date resulting from the use of the Cash
Collateral during the bankruptcy cases; and (iv) shall not attach to any causes of
action under chapter 5 of the Bankruptcy Code or any proceeds of those causes of
action; and

1

854033

d.      The entry of an order setting a hearing on the continued use of Cash Collateral and the final approval of the DIP Financing.

Blue Ivy owns the real estate located at 99 and 103 Main Street, Essex, Massachusetts (the "Real Property").  The Real Property is improved by a brewery and restaurant facility that were built by Blue Ivy and Great Marsh.[1]  Great Marsh previously operated the brewery and Blue Ivy leased the restaurant to third party operators.  The brewery and restaurant opened in November of 2019, just months prior to the onset of the COVID-19 pandemic.  The pandemic created significant problems for the Debtors, both from the loss of revenue and from delays in establishing the reputation of the brewery and restaurant.  These issues, in addition to a highly saturated craft beer market, continued to impair the Debtors' operations.  Eventually, the third party operating the restaurant terminated its relationship with Blue Ivy and Great Marsh ceased running the brewery, but has continued to operate a bar at the Real Property.  Prior to the Petition Date, Blue Ivy leased the brewery portion of the Real Property to a third party and is in discussions to lease the restaurant portion of the Real Property to a different third party.  Blue Ivy intends to sign a lease for the restaurant portion of the Real Property that, along with the lease for the brewery, will provide Blue Ivy and Great Marsh with the ability to fund a plan of reorganization.

In March of 2022, Blue Ivy borrowed $4,500,000 from Newburyport (the "Loan") in order to refinance its existing secured indebtedness.  The Loan was secured by a mortgage on the Real Property and an assignment of leases and rents.  Great Marsh guaranteed the Loan and secured that guaranty with a lien on its assets.[2]  Blue Ivy's two principals, John Collins and Sir Ian Brady, partially guaranteed the Loan.  Newburyport asserts that it is owed approximately

---

[1] Great Marsh filed a voluntary chapter 11 petition contemporaneously with Blue Ivy's chapter 11 petition.
[2]  The descriptions of Newburyport's claims and liens in this motion are informational only, and the Debtors reserve all of their rights, claims and defenses with respect to Newburyport's asserted claims and liens.

854033

$3,600,000 on account of the Loan.

The Debtors require the use of cash collateral in order to preserve the value of their assets while they restructure their obligations to creditors.  Absent the approval of the use of cash collateral, the Debtors will be unable to pay its operating expenses, resulting in the liquidation of their assets and a significant loss in the value of those assets.  Great Marsh has employees whose wages must be paid, and emergency consideration of this motion is therefore warranted.

In support of this motion, Blue Ivy avers as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§1408 and 1409.

2. The bases for relief are Sections 105, 363 and 364 of the Bankruptcy Code, Bankruptcy Rule 4001 and MLBR 4001-2.

### BACKGROUND

3. On June 9, 2026 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code.

4. Blue Ivy is a Massachusetts limited liability company that was formed in 2017 to, along with Great Marsh, develop and operate a brewery and restaurant.  John Collins is the manager of Blue Ivy.  *See Affidavit of John Collins in Support of First Day Motions* (the "Collins Affidavit") at ¶1.[3]

5. Great Marsh is a Massachusetts corporation also formed in 2017 to construct and operate a brewery on the Real Property.  John Collins is the president of Great Marsh.  *Id*. at ¶2.

---

[3] The Collins Affidavit has been filed contemporaneously with this motion.

3

6.     After obtaining the necessary permits, Blue Ivy began construction of a restaurant and state of the art brewery on the Real Property in early 2018.  Construction was completed and the brewery and restaurant facility opened in November of 2019.  Great Marsh operated the brewery, which supported a taproom operated by Great Marsh and supplied the restaurant with beer, which Blue Ivy leased to the Webber Restaurant Group ("WRG"), an unrelated third party. *Id*. at ¶6.

7.     Unfortunately, the COVID-19 pandemic started just three (3) months later, significantly impairing Blue Ivy's and Great Marsh's operations and creating substantial losses. *Id*. at ¶7.

8.     In March of 2022, Blue Ivy and Great Marsh re-financed their existing secured debt with the Loan.  *Id*. at ¶8.

9.     The losses and delays caused by the COVID-19 pandemic were too much for WRG to overcome, and it terminated its lease with Blue Ivy in March of 2022.  Great Marsh continued to operate the brewery and taproom.  *Id*. at ¶9.

10.     In May of 2022, Blue Ivy executed a service agreement with Craft Food Halls ("CFH"), an unrelated third party, to operate the restaurant.  CFH stayed for only two (2) months before deciding it would not continue and terminated its agreement.  *Id*. at ¶10.

11.     Blue Ivy attempted to locate other operators for the restaurant and, in an effort to increase revenue, Great Marsh expanded its operations to include canning and distributing its beer.  Great Marsh could not, unfortunately, expand its canning and distribution operations quickly enough to make up for the lost restaurant revenue, and Great Marsh ceased brewing in mid 2024.  *Id*. at ¶11.

4

12.     After discussions with Newburyport, Blue Ivy undertook the effort to sell the Real Property in conjunction with Great Marsh selling its brewery equipment.  Blue Ivy and Great Marsh negotiated extensively with three (3) primary potential buyers, reaching the letter of intent stage with one (1) potential buyer, before the sale effort ceased in early 2026.  *Id*. at ¶12.

13.     Blue Ivy and Great Marsh refocused their efforts on finding third parties to lease the brewery and restaurant.  Blue Ivy signed a ten (10) year lease for the brewery with Galy Co. ("Galy").  Blue Ivy is currently in discussions with three (3) potential parties to lease the restaurant and is confident it will reach final agreement with one (1) of those parties in the short term.  *Id*. at ¶13.

14.     Great Marsh continues to operate the tap room on the Real Property.  *Id*. at ¶14.

15.     The Galy lease and the restaurant lease will provide Blue Ivy and Great Marsh with the resources necessary to restructure their obligations and file a plan of reorganization.  *Id*. at ¶15.

A.     **The Debtors' Assets**

16.     On the Petition Date, Blue Ivy's assets consisted principally of (a) the Real Property, (b) the Galy lease for the brewery,  (c) fixtures and equipment associated with the Real Property, (d) cash, and (e) permits and licenses associated with the Real Property.  *Id*. at ¶16.

17.     Blue Ivy believes that fair market value of its assets on the Petition Date, assuming the restaurant was operating, was approximately $6,500,000, with the liquidation value being materially less.  The value of Blue Ivy's assets, however, will materially increase upon the execution of a lease for the restaurant portion of the Real Property.  *Id*. at ¶17.

5

854033

18.     On the Petition Date, Great Marsh's assets consisted principally of (a) brewing and related equipment, (b) cash, and (c) permits and licenses associated with the brewery. *Id.* at ¶18.

19.     Great Marsh believes that fair market value of its assets on the Petition Date was approximately $600,000, with the liquidation value being materially less. *Id.* at ¶19.

**B.     The Debtors' Liabilities[4]**

20.     Newburyport asserts that it is owed approximately $3,600,000 on account of the Loan.  At the time of the Loan, Blue Ivy executed a mortgage on the Real Property and a separate assignment of leases and rents in favor of Newburyport.  Great Marsh guaranteed the Loan and executed a security agreement in favor of Newburyport, who filed a UCC-1 financing statement with the Secretary of State for the Commonwealth of Massachusetts.  Newburyport therefore asserts secured claims against the Debtors. *Id.* at ¶20.

21.     The Debtors have not completed their review of equipment contracts and other documents to determine whether additional asserted secured claims exist.

22.     Newburyport is the only alleged secured creditor with an interest in the Debtors' Cash Collateral.

23.     The Debtors are unaware of any creditors that assert priority unsecured claims. *Id.* at ¶21.

24.     The non-priority unsecured claims against Blue Ivy total approximately $3,370,000. *Id.* at ¶22.

25.     The non-priority unsecured claims against Great Marsh total approximately $20,000. *Id.* at ¶23.

---

[4] Nothing in this motion is intended to acknowledge the validity of any claim or the validity, extent, or priority of any lien asserted against the Debtor.

854033

## ARGUMENT

26.     Attached as Exhibit A is a budget (the "Blue Ivy Budget") setting forth Blue Ivy's estimated receipts and disbursements for the period from the Petition Date through August 31, 2026 (the "Budget Period").  Blue Ivy requests the authority to use Cash Collateral substantially in accordance with the Blue Ivy Budget.

27.     Attached as Exhibit B is a budget (the "Great Marsh Budget") setting forth Great Marsh's estimated receipts and disbursements for the Budget Period.  Great Marsh requests the authority to use Cash Collateral substantially in accordance with the Great Marsh Budget.

### A.     Use of Cash Collateral.

28.     Section 363(e) of the Bankruptcy Code provides that a party with an interest in property proposed to be used, sold or leased by the trustee must receive adequate protection for such interest before the trustee may use, sell or lease such property.  *See* 11 U.S.C. § 363(e).

29.     Section 361 of the Bankruptcy Code provides that when adequate protection is required under section 363 of the Bankruptcy Code, such adequate protection may be provided by, *inter alia*, "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property."  11 U.S.C. § 361(2).

30.     Blue Ivy receives rent pursuant to the Galy lease and believes that Newburyport will assert an interest in those rents which constitute property of Blue Ivy's bankruptcy estate. *See In re Lyons*, 193 B.R. 637, 648-49 (Bankr. D. Mass. 1996) (Rents constitute property of bankruptcy estate since assignment of rents was for security purposes under Massachusetts law). Even if Newburyport has a perfected lien on Blue Ivy's rents, Blue Ivy may use those rents as cash collateral under section 363 of the Bankruptcy Code.  *See Id*. at 649 (Debtor may use rents

7

854033

as cash collateral); *Prudential Insurance Co. of America v. Boston Harbor Marina Co.,* 159 B.R. 616, 618 (D. Mass. 1993) ("a perfected security interest in rents . . . constitutes cash collateral").

31.     Great Marsh's revenue is from the operation of the tap room on the Real Property and consists of cash payments and credit card receipts.   It is not clear that Newburyport has a lien on Great Marsh's cash or credit card receipts, but out of an overabundance of caution, Great Marsh is requesting authority to use those assets in its operations, and preserving any dispute over Newburyport's asserted lien on those assets for another day.

32.     The Debtors will provide adequate protection to Newburyport in two primary ways.  First, the Debtors propose to grant replacement liens (the "Replacement Liens") that would be limited to the same types of post-petition property of the estate against which Newburyport held liens as of the Petition Date, and would maintain the same priority, validity and enforceability as Newburyport's pre-petition liens.  The Replacement Liens would be recognized only to the extent of the diminution in value of Newburyport's pre-petition collateral after the Petition Date resulting from the Debtors' use of the Cash Collateral during their bankruptcy cases.  The Replacement Liens would not attach to any causes of action under chapter 5 of the Bankruptcy Code or any proceeds of those causes of action.  Second, the Debtors will continue to preserve the value of their assets, including the Real Property, by insuring them, maintaing them and paying charges against them, including real estate taxes.

33.     The proposed Replacement Liens do not prejudice any rights, claims or defense the Debtors may have with respect to Newburyport's asserted liens and claims.  All of the Debtors' rights under section 506(c) of the Bankruptcy Code are preserved.  The proposed Replacement Liens do not violate any provision of MLBR 4001-2(c).

854033

34.     The entitlement to and measure of the protection required is always determined by the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's collateral during course of the bankruptcy case.  *See In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir.1987).  Adequate protection requires only that the value of the creditor's interest in the cash collateral be protected from diminution while the debtor is using the cash collateral.  *See United Savings Association of Texas v. Timbers of Inwood Forest Assoc.*, *Ltd.*, 484 U.S. 365 (1988).

35.     Because the Debtors' respective budgets demonstrates that the Debtors are at least operating at a break even pace, the Replacement Liens themselves constitute adequate protection within the meaning of sections 361 and 363 of the Bankruptcy Code.  *See In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) (Where debtor is generating new rents "the protected cash proceeds are being used to generate new collateral which will be of at least equivalent value of those replaced."); *In re Mullen*, 172 B.R. 473, 477-78 (Bankr. D. Mass. 1994) ("Assuming the debtor is operating at no less than a break even, the new collateral and proceeds will be of at least equivalent value of those they replace.  The same is true of each month's rents received by Blue Ivy.").

36.     The Debtors' use of Cash Collateral to preserve the value of their assets, including the Real Property, also constitutes sufficient adequate protection for Newburyport.  *See See Baybank-Middlesex v. Ralar Distributors*, 69 F.3d 1200, 1203 (1st Cir. 1995); *In re McCann*, 140 B.R. 926, 929 (Bankr. D. Mass. 1992); *In re Prichard Plaza, L.P.*, 84 B.R. 298 (Bankr. D. Mass. 1988).

37.     The use of Cash Collateral and the granting of the proposed Replacement Liens will permit the Debtors to proceed with its plan to restructure its debts and reorganize.  Absent

9

854033

such a reorganization, the Debtors will be forced to liquidate their assets resulting in a substantial loss in the value of those assets and, likely, the loss of a material dividend on the claims of the Debtors' creditors.  The use of Cash Collateral proposed in this motion is therefore in the best interests of the Debtors' respective creditors and bankruptcy estates.

### NOTICE

38.     This motion will be served upon the United States Trustee, counsel to the Newburyport, the Debtors' twenty (20) largest creditors, the Internal Revenue Service, the Massachusetts Department of Revenue, and all parties who have requested notice in the Debtors' bankruptcy cases.  The Debtors submit that such service is appropriate given the relief requested and the circumstances of their bankruptcy cases.

[this space intentionally left blank

854033

WHEREFORE, the Debtors request that the Court enter an order: (a) approving the notice of this motion as described above; (b) authorizing the Debtors to use Cash Collateral on an expedited basis as proposed in this motion pending the scheduling of a hearing on the continued use of Cash Collateral; (c) granting Newburyport replacement liens in accordance with the terms of this motion; and (d) granting such other relief as is just and proper.

Respectfully Submitted,

BLUE IVY, LLC,
GREAT MARSH BREWING COMPANY,
By their proposed counsel,


/s/ *D. Ethan Jeffery*
D. Ethan Jeffery (BBO #631941)
Conner B. Verreaux (BBO #711723)
MURPHY & KING, Professional Corporation
28 State Street
Suite 3101
Boston, MA  02109
Tel: (617) 423-0400
Fax: (617) 556-8985
Email: ejeffery@murphyking.com

Dated:  June 12, 2026

11

854033

## **Exhibit A**

Blue Ivy, LLC Budget

| | June 2026 | July 2026 | August 2026 |
|---|---|---|---|
| **Restaurant Revenue** | | | |
| **Base Rent** | 3,000 | 4,000 | 3,800 |
| **Total Restaurant Revenue** | 3,000 | 4,000 | 3,800 |
| **Brewery Revenue** | | | |
| **Rent** | 15,000 | 15,000 | 15,000 |
| **Total Brewery Revenue** | 15,000 | 15,000 | 15,000 |
| **Total Revenue** | 18,000 | 19,000 | 18,800 |
| | | | |
| **Utilities** | | | |
| **Electricity** | 5,446 | 6,138 | 5,049 |
| **Gas** | 959 | 1,194 | 825 |
| **Verizon** | 55 | 55 | 55 |
| **Internet** | 376 | 376 | 376 |
| **CO2** | 440 | 440 | 440 |
| **Water & Sewer** | 500 | | |
| **Total Utilties** | 7,776 | 8,204 | 6,744 |
| **Taxes** | | | |
| **Real Estate Tax** | - | 12,097 | - |
| **Total Taxes** | - | 12,097 | - |
| **Admin & General Expenses** | | | |
| **Landscaping/Snowplowing** | - | - | - |
| **Insurance** | 6,464 | 6,464 | 6,464 |
| **Dumpster** | 21 | 21 | 21 |
| **Pest Control** | 272 | 272 | 272 |
| **Alarm Company** | 93 | 93 | 93 |
| **Total Admin & General Expenses** | 6,850 | 6,850 | 6,850 |
| | | | |
| **Total Expense** | 14,625 | 27,150 | 13,594 |
| | | | |
| **Net Income** | 3,375 | (8,150) | 5,206 |
| | | | |
| **Beginning Cash** | - | 3,375 | (4,776) |
| **Change in Cash** | 3,375 | (8,150) | 5,206 |
| **Ending Cash** | 3,375 | (4,776) | 431 |

**<u>Exhibit B</u>**

Great Marsh Brewing Co. Budget

|  | June 2026 | July 2026 | August 2026 |
|---|---|---|---|
| **Restaurant Revenue** | | | |
| Net Sales | 8,000 | 9,000 | 8,500 |
| Tips | 1,200 | 1,313 | 1,544 |
| Total Restaurant Revenue | 9,200 | 10,313 | 10,044 |
| **Total Revenue** | 9,200 | 10,313 | 10,044 |
| | | | |
| **Employee Costs** | | | |
| Salary | 3,835 | 3,314 | 3,277 |
| Tips | 1,200 | 1,313 | 1,544 |
| Workers Comp | 25 | 25 | 25 |
| Total Employee Costs | 4,500 | 4,600 | 4,800 |
| **Total Employee Costs** | 4,500 | 4,600 | 4,800 |
| | | | |
| **Admin & General Expenses** | | | |
| Meals Tax | 400 | 461 | 514 |
| Beer | 500 | 500 | 500 |
| Liquor | 250 | 250 | 250 |
| NA Purchases | 40 | 40 | 40 |
| Snacks | 50 | 50 | 50 |
| **Total Admin & General Expenses** | 1,240 | 1,301 | 1,354 |
| | | | |
| **Rent** | 3,000 | 4,000 | 3,800 |
| | | | |
| **Total Expense** | 8,740 | 9,901 | 9,954 |
| | | | |
| **Net Income** | 460 | 412 | 90 |
| | | | |
| **Beginning Cash** | 3,560 | 4,020 | 4,432 |
| **Change in Cash** | 460 | 412 | 90 |
| **Ending Cash** | 4,020 | 4,432 | 4,522 |