**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **GREAT MARSH BREWING COMPANY,** | **Case No. 26-11364-CJP** |
| **Debtor.** | |

**AFFIDAVIT OF JOHN COLLINS IN**
**SUPPORT OF MOTION TO USE CASH COLLATERAL**

Pursuant to 28 U.S.C. § 1746, I, John Collins, submit this affidavit in support of the

*Motion For (A) The Use of Cash Collateral, (B) The Granting of Replacement Liens, And*

*(C) Additional Relief* (the "Cash Collateral Motion") filed by Blue Ivy, LLC ("Blue Ivy") and

Great Marsh Brewing Company ("Great Marsh", and together with Blue Ivy the "Debtors"),

and state as follows:

1.      Blue Ivy is a Massachusetts limited liability company.  I am the Blue Ivy's

manager and own seventy percent (70%) of the membership interests in Blue Ivy.  As an officer

of Blue Ivy, I am familiar with Blue Ivy's day-to-day operations, business affairs, assets,

liabilities and books and records.

2.      Great Marsh is a Massachusetts corporation.  I am the president of Great Marsh

and own seventy percent (70%) of the stock in Great Marsh.

3.      I believe that the Debtors' estates would suffer immediate and irreparable harm

absent the ability to utilize cash collateral to pay necessary expenses and to otherwise continue

the Debtors' operations.  The approval of the relief requested in the Cash Collateral Motion will

minimize disruptions to the Debtors' operations and is critical to preserving and maximizing the

value of the Debtors' respective estates and assets.

1

854265

4.      Except as otherwise indicated, all the statements and factual representations set forth in this affidavit are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify to the facts set forth in this affidavit.

## I.      Background

5.      Blue Ivy owns the real estate located at 99 and 103 Main Street, Essex, Massachusetts (the "Real Property").  The Real Property is improved by a brewery and restaurant facility that were built by Blue Ivy and Great Marsh.

6.      After obtaining the necessary permits, Blue Ivy began construction of a restaurant and state of the art brewery on the Real Property in early 2018.  Construction was completed and the brewery and restaurant facility opened in November of 2019.  Great Marsh operated the brewery, which supported a taproom operated by Great Marsh and supplied the restaurant with beer, which Blue Ivy leased to the Webber Restaurant Group ("WRG"), an unrelated third party.

7.      Unfortunately, the COVID-19 pandemic started just three (3) months later, significantly impairing Blue Ivy's and Great Marsh's operations and creating substantial losses.

8.      In March of 2022, Blue Ivy and Great Marsh re-financed their existing secured debt with the Loan.

9.      The losses and delays caused by the COVID-19 pandemic were too much for WRG to overcome, and it terminated its lease with Blue Ivy in March of 2022.  Great Marsh continued to operate the brewery and taproom.

10.      In May of 2022, Blue Ivy executed a service agreement with Craft Food Halls ("CFH"), an unrelated third party, to operate the restaurant.  CFH stayed for only two (2)

854265

months before deciding it would not continue and terminated its agreement.

11.     Blue Ivy attempted to locate other operators for the restaurant and, in an effort to increase revenue, Great Marsh expanded its operations to include canning and distributing its beer.  Great Marsh could not, unfortunately, expand its canning and distribution operations quickly enough to make up for the lost restaurant revenue, and Great Marsh ceased brewing in mid 2024.

12.     After discussions with Newburyport, Blue Ivy undertook the effort to sell the Real Property in conjunction with Great Marsh selling its brewery equipment.  Blue Ivy and Great Marsh negotiated extensively with three (3) primary potential buyers, reaching the letter of intent stage with one (1) potential buyer, before the sale effort ceased in early 2026.

13.     Blue Ivy and Great Marsh refocused their efforts on finding third parties to lease the brewery and restaurant.  Blue Ivy signed a ten (10) year lease for the brewery with Galy Co. ("Galy").  Blue Ivy is currently in discussions with three (3) potential parties to lease the restaurant and is confident it will reach final agreement with one (1) of those parties in the short term.

14.     Great Marsh continues to operate the tap room on the Real Property.

15.     The Galy lease and the restaurant lease will provide Blue Ivy and Great Marsh with the resources necessary to restructure their obligations and file a plan of reorganization.

A.     **The Debtors' Assets**

16.     On the Petition Date, Blue Ivy's assets consisted principally of (a) the Real Property, (b) the Galy lease for the brewery,  (c) fixtures and equipment associated with the Real Property, (d) cash, and (e) permits and licenses associated with the Real Property.

17.     I believe that fair market value of its assets on the Petition Date, assuming the restaurant was operating, was approximately $6,500,000, with the liquidation value being

3

854265

materially less.  The value of Blue Ivy's assets, however, will materially increase upon the execution of a lease for the restaurant portion of the Real Property.

18.    On the Petition Date, Great Marsh's assets consisted principally of (a) brewing and related equipment, (b) cash, and (c) permits and licenses associated with the brewery.

19.    I believe that fair market value of its assets on the Petition Date was approximately $600,000, with the liquidation value being materially less.

B.    **The Debtors' Liabilities**[1]

20.    Newburyport asserts that it is owed approximately $3,600,000 on account of the Loan.  At the time of the Loan, Blue Ivy executed a mortgage on the Real Property and a separate assignment of leases and rents in favor of Newburyport.  Great Marsh guaranteed the Loan and executed a security agreement in favor of Newburyport, who filed a UCC-1 financing statement with the Secretary of State for the Commonwealth of Massachusetts.  Newburyport therefore asserts secured claims against the Debtors.

21.    I am unaware of any creditors that assert priority unsecured claims.

22.    The non-priority unsecured claims against Blue Ivy total approximately $3,370,000.

23.    The non-priority unsecured claims against Great Marsh total approximately $20,000.

C.    **The Cash Collateral Motion**

24.    The Debtors require the use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code) to fund their operations and pay the necessary expenses to preserve the value of their businesses and its assets.  The Debtors seek authority to use Cash Collateral in

---

[1] Nothing in this motion is intended to acknowledge the validity of any claim or the validity, extent, or priority of any lien asserted against the Debtor.

4

854265

accordance with the budgets attached to the Cash Collateral Motion (collectively the "Budgets").

25.     The Budgets reflect the usual and ordinary revenue and expenses from the operation of the Debtors' respective businesses.

**II.     Conclusion**

26.     I have reviewed each of the First Day Motions and have discussed them with the Debtor's counsel and advisors. Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing Affidavit are true and correct to the best of my information and belief.

_____
John Collins, Manager/President

Dated: June 12, 2026

5

854265